## TOM KEY *v.* THE STATE.

1. AGGRAVATED ASSAULT AND BATTERY.— INDICTMENT which charges that the defendant "did make an aggravated assault and battery on W. J. J. with a pistol," while good for a simple assault and battery, is not sufficient to charge an aggravated assault and battery.

2. SAME.— Indictment for an aggravated assault and battery should allege the necessary acts and facts constituting the offense; and if the aggravation consisted in making the assault with a deadly weapon, it should be so alleged.

3. SAME — DEADLY WEAPON — PRACTICE.— A pistol is not necessarily a deadly weapon. The deadly character of the weapon used must be alleged and proved.

4. SAME — CHARGE OF THE COURT.— The court instructed the jury that if they found the defendant guilty of assault and battery they should assess his fine at not less than $25 nor more than $1,000, or by imprisonment in the county jail not less than one month nor more than two years, or by both such fine and imprisonment. *Held* error; such punishment is that prescribed for aggravated assault and battery, but not for simple assault and battery, and when the term *assault and battery* is used, simple assault and battery is meant.

5. SAME.— The defendant requested the court to charge the jury that "if they believed from the evidence that the defendant is not guilty of an aggravated assault and battery, or if they have a reasonable doubt, then they will acquit him of aggravated assault and battery, and further consider whether or not he is guilty of a

simple assault and battery; and if they believe from the evidence that he is guilty of simple assault and battery, then they will fine him in any sum not less than five dollars, nor more than twenty-five dollars." *Held*, that the charge asked embodied the law applicable to the evidence in the case, and the court erred in refusing to give it.

APPEAL from the County Court of Wilson. Tried below before the Hon. A. R. STEVENSON, Special County Judge.

The prosecution was intended to be for an aggravated assault and battery on W. J. Johnson. The jury found the defendant "guilty as charged in the indictment," and assessed his punishment at a fine of fifty dollars.

W. J. Johnson testified, for the State, that on the 6th day of December, 1881, he lived in Union Valley, Wilson county, Texas. On that morning he heard some shooting near by in a field under the control of J. P. and Tom Key as the tenants of Mrs. Halstine. He went around the northwest corner of the field and entered it at a gap in the fence, and there met a man whom he did not then know, but whom he knows now by the name of Marsh. The witness asked Marsh some questions about the shooting, and Marsh replied that he knew nothing about it. The witness then went on to where old man Key and the defendant were at work in the field, and asked them what that shooting meant. He told the Keys that one of his oxen had come home shot, that he expected the animal to die and he wanted the Keys to pay him for it. Old man Key replied that he had shot no cattle, and for the witness to "pop his whip" and go ahead, and to inform him when pay was secured. The defendant then said that the witness had some cattle that were bad fence-breakers, and that when people would tie their heads down to keep them out of fields, the witness would go around and cut them loose. The witness replied that "that was a lie," when the defendant pulled out his pistol and asked if the

witness intended to call him a liar. The witness answered that he did not know that he had any reason to call him a liar, but "that it was a lie." The defendant then said that if the witness meant to call him a liar, he would blow a hole through the witness. The witness told him that he was not afraid of his shooting. At this time J. P. Key came running up and said that he was man enough for the witness on any part of the ground. He caught the witness by the collar and pulled him around, and then the defendant struck the witness across the right side of his head with the pistol. The witness was blinded by the blow and fell up against old man Key. In the struggle which ensued between the witness and old man Key, the former threw the latter and was in the act of striking him, when the defendant kicked the witness over the eye with the heel or toe of his boot, knocking him about six feet. Then old man Key jumped on the witness and choked him, while the witness pulled the old man's whiskers. Old man Key told the witness to let go of his whiskers. The witness retorted by telling the old man to let him loose. Old man Key then got up. The witness was badly hurt. His head was bruised, and his skin broken in many places. His eyes have been sore ever since, and he attributes this to the injuries he received in the encounter.

Cross-examined, the witness said it may be imagination about the injuries affecting his eyes. They were sore all of the previous fall, caused then by cotton-lint and dust from a cotton gin. Marsh was at the gap in the fence at the time of the fight. The witness did not see the defendant strike him over the head with the pistol, but knows very well that he did so. He did not see the defendant kick him, but he very well knew that the wound on his forehead was inflicted by the heel or toe of the defendant's boot. The witness could not tell how he knew that he was struck and kicked; he did not see it

done, but he "just simply knew that Tom Key did it, and did it in the manner stated." The witness did not know whether or not he spoke to Marsh in an angry tone. He was mad when he passed Marsh. Marsh did not come near the fight. The witness did not look back, but he knew that Marsh was at the gap, because he left him there. After the fight was over the witness saw the man Marsh 75 or 100 yards away from where the fight occurred. The witness was about 266 long steps from the gap, and Marsh was about half way between. The witness did not know that his son Stevy Johnson had followed him with a gun, or that he was standing outside of the field with a gun. If he had known it, "things would have gone quite different."

Stevy Johnson testified for the State that when his father, the prosecuting witness, started to the field where the Keys were, he, the witness, went and got a Winchester gun from the saddle of Ed Hobbs, who had left it on his horse at the witness's store, and witness followed his father. The witness stopped first near Creechi's store, and then went nearer. Then he saw the man Marsh running towards his father and the Keys, and he approached nearer. Marsh did not get anywhere near the place of the fight; he at no time approached it nearer than 100 yards. The witness saw no part of the difficulty, but saw his father after his return. He had some bruises on the right side of his head and one above the eye. The skin was cut in places.

On cross-examination the witness stated that he took the gun because he did not know what might happen. He did not expect a difficulty, but thought probably that some one was trying to kill the ox for beef, and that he might possibly need a gun. The ox was at the house and not at the field at the time the witness and his father went to the field. The witness did not stand upon a stump or log outside of the field. When he saw Marsh at the gap the witness did not know him.

D. L. Wiley testified, for the defense, that he arrived at Creechi's store about the time that Stevy Johnson was passing it with a gun, going towards Key's field. He told Stevy to stop, and not to go to the field where the Keys were, with a gun,— that he had no business there with a gun. He told Stevy this because he was apprehensive of a serious difficulty if he went there with a gun. Stevy stopped for awhile, and then started again, when Mr. Creechi called to him and told him to stop, and not to go to the field with the gun. He stopped again some distance between Creechi's store and the place where the fight occurred. In a few minutes the witness saw a man running from the gap towards the place of the fight, who very soon passed out of sight. The witness could not say how much of the difficulty the man saw or heard. When the witness got in sight of Johnson and the Keys, Marsh was about 20 or 30 yards from Johnson, and the Keys were between them. Steve Johnson perched himself on a stump outside of the field.

Cross-examined, the witness stated that after old man Johnson left Marsh at the gap, he had plenty of time to have got to where the Keys were and have a fight before Marsh left the gap. It may have been ten minutes afterwards. The witness ran up towards the field where the Keys and Johnson were. The fight was over, but four men were scattered about. W. J. Johnson was coming away from the place where the fight occurred, and had gone some distance. Marsh was in the path leading to the place where the fight occurred, and about 20 yards distant from it.

R. R. Creechi testified, for the defense, that he saw W. J. Johnson when he went to Key's field, and he saw Steve Johnson start to the field with a Winchester gun in his hands. Wiley and the witness, fearful of a serious difficulty, warned him not to go to the field with the gun. He took a position some distance out in front of the witness's store, and remarked that he was going to keep an

eye on the man at the gap. The witness could see no part of the fight from his store. He supposed that the wounds on Johnson's head and face could have been made by a fist, but he did not examine them closely. When Johnson·returned to the store some one asked him if he was much hurt, and he said no, that he was not. The witness told Johnson that he got what he needed; that he had no business going into the Keys' field and "tackling" them.

Cross-examined, the witness said that Johnson had plenty of time to have gone up to the place and have a fight before Marsh left the gap.

The substance of the testimony of A. M. Marsh was that on his return from Key's field with a load of potatoes he met old man Johnson at the gap, who asked him angrily what that shooting was about. Witness answered that he knew nothing about it, and urged old man Johnson not to go into the field where the Keys were, as he might foment trouble. Johnson made no reply but went on, and the witness followed him about half way to where the Keys were. He heard Johnson tell old man Key that he had been shooting his, Johnson's, stock, and that he intended to have damages. Key told Johnson that he had shot no stock, to pop his whip and go ahead,· and to let him know when he recovered damages, and ordered him to leave the field. Tom Key then told Johnson that his stock were bad at fence breaking, and that he had been told that neighbors had tied their heads down, and that he, Johnson, would go around at night and cut them loose. Johnson said to Tom Key, "You are a liar, sir, and I can whip you," and placed himself in a striking attitude. Johnson and Tom Key advanced and struck about the same time. Old man Key came up and pulled Tom off, and said, "I'm man enough for old man Johnson; don't you fight old men." At this remark old man Johnson struck old man Key on the head with

his fist, and the two old men clinched, and both fell, old man Key turning on top. By this time the witness had reached the parties. Tom Key told his father to get up and not hurt old man Johnson, and Key did so. This, the witness stated, was every particular of the fight. The breeze was favorable, and he saw and heard the whole of it. The witness lived in Gonzales county, and was a stranger to almost every one, in Union Valley. He was related to old man Key by marriage, having married a niece of Key's wife, a cousin of the defendant. The defendant was in his shirt sleeves and had no pistol.

Richards corroborated the testimony of Wiley and Creechi.

*A. J. Williams*, for the appellant.

*H. M. Holmes*, for the State.

Willson, J. The information charges that "Tom Key did make an aggravated assault and battery on W. J. Johnson, with a pistol." While we think this indictment good for a simple assault and battery, we are of the opinion that it does not sufficiently charge an aggravated assault and battery. It should allege the necessary acts and facts constituting the offense. If the aggravation consisted in making the assault with a deadly weapon, it should be so alleged. A pistol is not necessarily a deadly weapon. (*Hunt* v. *State*, 6 Texas Ct. App. 663.) The deadly character of the weapon must be alleged and proved.

There is a fatal defect in the charge of the court. It instructs the jury, "If you find the defendant guilty of assault and battery you will assess his fine not less than twenty-five nor more than one thousand dollars, or imprisonment in the county jail not less than one month nor more than two years, or by both such fine and imprisonment." This is the punishment prescribed by law

for aggravated assault and battery, but not for simple assault and battery. When the term assault and battery is used, simple assault and battery is meant thereby, and the jury would most likely so understand it. The court gave no instructions in regard to simple assault and battery, and the punishment prescribed therefor, notwithstanding the facts of the case manifestly demanded such a charge. The defendant excepted to the charge of the court at the time, and also requested the following charge to be given to the jury: "If the jury believe from the evidence that he is not guilty of an aggravated assault and battery, or, if they have a reasonable doubt, then they will acquit the defendant of aggravated assault and battery and further consider whether or not he is guilty of a simple assault and battery; and if they believe from the evidence that he is guilty of simple assault and battery, they will fine him in any sum not less than five dollars, nor more than twenty-five dollars." This charge was refused by the court. It was the law as applicable to the evidence in the case, and should have been given. The jury assessed the punishment of the defendant at a fine of fifty dollars, which was the lowest penalty they could assess under the erroneous charge of the court.

For the errors we have named the judgment is reversed and the cause remanded.

*Reversed and remanded.*